UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MADISON PARK CHURCH OF GOD, INC. | ) | Case No. 13-07430-RLM-11 |
| D/B/A MADISON PARK CHURCH OF GOD, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**DEBTOR'S DISCLOSURE STATEMENT WITH REGARD
TO PLAN OF REORGANIZATION DATED SEPTEMBER 11, 2013**

**Counsel for the Debtor:**

Jerald I. Ancel
Marlene Reich
Jeffrey J. Graham
Erin C. Nave
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN  46204
Telephone:  (317) 713-3500
Facsimile:  (317) 713-3699
Email: jancel@taftlaw.com
         mreich@taftlaw.com
         jgraham@taftlaw.com
         enave@taftlaw.com

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS AN AUTHORIZED SOLICITATION OF VOTES ON THE DEBTOR'S PLAN OF REORGANIZATION DATED SEPTEMBER 11, 2013 UNDER 11 U.S.C. § 1125.**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION………………………………………………….. | 1 |
| II. | BACKGROUND OF THE DEBTOR……………………………….. | 4 |
| | A. Historical Information…………………………………… | 4 |
| | B. Financing Details………………………………………… | 5 |
| III. | THE DEBTOR DURING THE CHAPTER 11 CASE………………… | 6 |
| IV. | THE PLAN………………………………………………………… | 6 |
| | A. Parties Authorized to File a Plan……………………… | 7 |
| | B. Purpose of the Plan……………………………………… | 7 |
| | C. Treatment of Unclassified Claims……………………… | 7 |
| |    1. Administrative Claims……………………………… | 7 |
| |    2. Administrative Claim Bar Date…………………… | 8 |
| |    3. Priority Taxes……………………………………… | 8 |
| | D. Treatment of Claims…………………………………….. | 8 |
| | E. Funding of the Plan……………………………………… | 10 |
| | F. Execution of Amended and Restated Instruments and Vesting of Assets in the Reorganized Debtor…………………… | 10 |
| | G. Authorization to Effectuate the Plan…………………… | 11 |
| | H. Causes of Action and Bankruptcy Causes of Action………………….. | 11 |
| | I. Executory Contracts……………………………………… | 12 |
| |    1. Treatment of Executory Contracts……………….. | 12 |
| |    2. Cure of Defaults for Assumed and Assigned Executory Contracts……………………………….. | 12 |
| |    3. Resolution of Objections to Assumption and Assignment of Executory Contracts or Cure Payments………………………….. | 12 |
| | J. Provisions Governing Distributions…………………….. | 13 |
| | K. Exculpation……………………………………………… | 14 |
| | L. Management of the Reorganized Debtor………………… | 15 |
| | M. Effects of Confirmation………………………………… | 15 |
| | N. Retention of Bankruptcy Court Jurisdiction………………… | 16 |
| | O. Modification of the Plan……………………………….. | 16 |
| | P. Discharge of Debtor Pursuant to the Plan…………………… | 17 |
| | Q. Tax Consequences of the Plan…………………………… | 17 |
| V. | CONFIRMATION OF THE PLAN……………………………….. | 17 |
| | A. Acceptance or Rejection of the Plan…………………….. | 17 |
| | B. Unfair Discrimination and Fair and Equitable Tests………………….. | 18 |
| | C. Best Interests Tests……………………………………… | 20 |
| | D. Feasibility……………………………………………….. | 22 |
| VI. | CONCLUSION…………………………………………………… | 22 |

**EXHIBITS**

Exhibit A – Debtor's Plan of Reorganization
Exhibit B – Liquidation Analysis
Exhibit C – Financial Projections

## I.   INTRODUCTION

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under this chapter, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similar situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a case under chapter 11 of the Bankruptcy Code creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the commencement date.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its assets as a debtor-in-possession.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims and equity interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by a bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

Certain holders of claims against, and interests in, a debtor are permitted to vote to accept or reject a chapter 11 plan.  Prior to soliciting acceptances of the proposed plan, § 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.

Chapter 11 does not require that each holder of a claim or interest in a debtor vote in favor of a plan of reorganization for such plan to be confirmed.  At a minimum, however, a plan must be accepted by at least one class of claims impaired under the plan, such acceptance being made by the holders of a majority in number and two-thirds in amount of the claims actually voting in such class.

Madison Park Church of God, Inc. d/b/a Madison Park Church of God, as debtor and debtor-in-possession (the "Debtor")[1], hereby submits this Disclosure Statement with regard to the Debtor's Plan of Reorganization dated September 11, 2013 (the "Plan") pursuant to § 1125 of title 11 of the United States Code (the "Bankruptcy Code").  This Disclosure Statement is being provided to all Holders of Claims against the Debtor. Since the Debtor is a not for profit religious corporation, there are no equity interests. The Debtor believes that this Disclosure Statement contains "adequate information," as that term is defined in § 1125(a)(1) of the Bankruptcy Code,[2] to allow Holders of Claims to make an informed judgment about the Plan and to cast a vote accepting or rejecting the Plan.

**THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION (THE "BANKRUPTCY COURT") [HAS APPROVED] THIS DISCLOSURE STATEMENT.  THIS APPROVAL DOES NOT CONSTITUTE A DETERMINATION OF THE MERITS OF THE ACCOMPANYING PLAN.  RATHER, THE APPROVAL HEREOF MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT YOU TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING YOUR RIGHTS TO VOTE UPON THE PLAN.**

---

1  Capitalized terms not defined herein shall have the meanings ascribed to them in the Debtor's Plan of Reorganization dated September 11, 2013 and reference should be made thereto.

2  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a typical Holder of a Claim classified under the Plan to make an informed judgment about the Plan and to vote whether to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES FOR THE ACCEPTANCE OR REJECTION OF THE PLAN. NO REPRESENTATION CONCERNING THE DEBTOR, ITS OPERATIONS, OR THE VALUE OF ITS ASSETS IS AUTHORIZED BY THE BANKRUPTCY COURT, EXCEPT AS EXPLICITLY SET FORTH HEREIN OR IN ANY OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. YOU SHOULD NOT RELY ON ANY OTHER DOCUMENT(S) PURPORTING TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES FOR THE PLAN, AND ANY SUCH UNAUTHORIZED DOCUMENTS SHOULD BE REPORTED TO DEBTOR'S COUNSEL, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS IT MAY DEEM APPROPRIATE.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSIONER OF THE STATE OF INDIANA OR ANY OTHER STATE OR COMMONWEALTH. THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED HEREIN EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPLIED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION, AND BELIEF. THE RECORDS KEPT BY THE DEBTOR AND INFORMATION PROVIDED HEREIN ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.**

**THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. YOU ARE ENCOURAGED TO READ AND REVIEW THE FULL TEXT OF THE PLAN AND TO READ AND REVIEW CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, SCHEDULES OR OTHER ATTACHMENTS THERETO, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE AND YOU MUST CONSIDER BOTH SO YOU CAN BE ADEQUATELY INFORMED.**

**EXCEPT AS OTHERWISE INDICATED, THE STATEMENTS IN THIS DISCLOSURE STATEMENT ARE MADE AS OF SEPTEMBER 11, 2013 AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, IMPLY THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER SEPTEMBER 11, 2013. ANY ESTIMATE OF CLAIMS IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS ALLOWED BY THE BANKRUPTCY COURT.**

**THE PRESENCE OR ABSENCE OF A:  (A) CLAIM OBJECTION; (B) CAUSE OF ACTION; OR (C) BANKRUPTCY CAUSE OF ACTION SHALL NOT SERVE AS A WAIVER OF THE DEBTOR'S RIGHT TO FILE OR TERMINATE THE FOREGOING IN THE FUTURE EXCEPT AS PROVIDED IN THE PLAN.**

**THIS DISCLOSURE STATEMENT IS BOUND BY THE DEFINITIONS OF THE ACCOMPANYING PLAN UNLESS CONTEXT DICTATES OTHERWISE.**

## II.    BACKGROUND OF THE DEBTOR

A.    Historical Information

The Debtor originally incorporated as an Indiana not for profit corporation in August 1931 under the name North Anderson Church of God.  In June 2007, the Debtor changed its name from North Anderson Church of God to Madison Park Church of God, Inc.  It was at this time that the Debtor moved into its new facilities adjacent to I-69, near exit 226.  The development of the over 200-acre site (including construction of the Debtor's community life center, city streets, water delivery and storm water management systems, etc.) was financed by a bond issue, managed by a financial services firm in California.  The Debtor agreed to retire the bonds within 30 years.

The bond indenture was conceived, in part, with an eye to the sale of many of the Debtor's real estate assets (at four locations with Anderson mailing addresses) within the first five years of its term.  The Debtor owns substantial and, what was then believed to be, very marketable property in Madison County.  A nearly $6,000,000 balloon payment due in 2012 stood on the premise that the Debtor could translate property into cash, while at the same time increase its charitable income in a way to meet the need.

Events have provided otherwise, of course.  In the first year following the bond financing, the American economy faltered under the wave of the popularly dubbed Great Recession.  Anderson, Indiana plunged even deeper as General Motors declared bankruptcy with devastating impacts on career employees (many of whom took early

4

retirements in their 50's), saw their pensions reduced and their health insurance compromised (if not lost altogether).

The community's commercial real estate market collapsed; the appraised value of the Debtor's real estate assets has been halved; none of its properties have been sold (even though aggressively marketed at deep discounts). While meeting its other obligations under the bond indentures, the Debtor, consequently, failed to meet its balloon payment in July 2012.

B.    Financing Details

The financing for constructing the Debtor's new facility and repaying existing debt totaled $17,454,000 and consisted initially of three (3) bridge loans which were to be retired through the issuance of bonds in three (3) separate transactions dated July 31, 2007. The Series A First Mortgage Bonds in the aggregate original principal amount of $11,300,000 were not fully sold. As a result, the bridge lender on this portion of the financing, currently OSK, is still owed approximately 45% of the outstanding balance on its loan which matured in July 2008. The Series B Subordinate General Mortgage Bonds in the aggregate original principal amount of $3,835,000 required one balloon payment in July 2012 which was not made. The Series C General Obligation Bonds in the aggregate original principal amount of $2,319,000 were to receive semi-annual payments of principal and interest over a period of 14 years commencing in January, 2008.

In the summer of 2011, the bridge lender on the Series A First Mortgage Bonds whose note matured in July 2008, demanded payment from the Debtor on the balance due which was in excess of $5,000,000. In addition, the Debtor faced a balloon

payment within a year of over $6,000,000 to the Series B bondholders. Knowing that the Debtor had no ability to make these lump sum payments, the Debtor began negotiating repayment terms which culminated in May 2013 with the execution of a Term Sheet (the "Term Sheet") by and among the Debtor, OSK, the Series A Trustee and the Series B Trustee which provides the payment terms set forth in the Plan.

### III.   THE DEBTOR DURING THE CHAPTER 11 CASE

After the commencement of the Chapter 11 Case, the Debtor received authority to pay prepetition wages and related expenses in order to permit the Debtor to continue its operations while moving quickly towards Confirmation of the Plan.

Almost immediately following the Petition Date, the Debtor filed the Plan, the terms of which are consistent with the Term Sheet and which has received the written approval of OSK, the Series A Trustee and the Series B Trustee.

### IV.   THE PLAN

A copy of the Plan is attached as **Exhibit A**. The summary of the Plan contained herein is qualified in its entirety by reference to the full text of the Plan. Should there be any discrepancy between the summary contained in this Disclosure Statement and the express provisions of the Plan, the Plan shall control.

A.    Parties Authorized to File a Plan

The Debtor has the exclusive right to file a plan in this Chapter 11 Case through and including October 9, 2013.

B.    Purpose of the Plan

The purpose of the Plan is to restructure the Debtor's obligations so that they can be satisfied in full over time by the Debtor's cash flow from member tithings, member donations, and the disposition of the Sale Property.  The Debtor believes that the reorganization contemplated by the Plan is in your best interests and the best interests of all the Debtor's creditors.  If the Plan is not confirmed, the Debtor believes that it will be forced to liquidate under chapter 7 of the Bankruptcy Code.  In that event, the Debtor believes that creditors would realize a less favorable distribution of value, or no value at all, for their Claims.

C.    Treatment of Unclassified Claims

1.    ADMINISTRATIVE CLAIMS

Holders of Allowed Administrative Claims shall be paid in full through one of the following methods, in the sole discretion of the Reorganized Debtor:  (a) if not already paid, on the later of the Distribution Date or as soon as practical after the date the Administrative Claim becomes an Allowed Claim; or (b) if not yet due and payable, in the ordinary course of business.

2.    ADMINISTRATIVE CLAIM BAR DATE

The Holder of an Administrative Claim for professional fees and expenses pursuant to §§ 330, 331 or 503(b) of the Bankruptcy Code must file a motion for approval of such Administrative Claim for all fees and expenses incurred through the Effective Date within thirty (30) days of the Effective Date.

3.    PRIORITY TAXES

The Debtor has scheduled real estate taxes due and payable to the Madison County Treasurer on November 10, 2013 and May 10, 2014 in the aggregate amount of $30,675.37.  The Internal Revenue Service has filed a Claim in the amount of $10,419.47 for withholding taxes due and payable after the Petition Date.  The Allowed Claims for such taxes will be paid in full when due.

D.    Treatment of Claims

The following summarizes the treatment of Classes of Claims under the Plan.

| Class/Type of Claim | Projected Amount of Claims | Projected Recovery | Impaired/ Unimpaired |
|---|---|---|---|
| Class 1: Allowed Secured Claim of OSK | Approximately $5,600,000.00 | 100% | Impaired |
| **Class Treatment** - Paid in full within 10 years.  Monthly payments of principal and interest are (a) years 1 through 4, $22,950 unless the Scatterfield Road Property has sold; (b) if the Scatterfield Road Property has sold, years 3 and 4, $24,750; (c) years 5 through 7, $26,550; and (d) years 8 through 10, $28,125.  Interest on the balance due shall be paid at the following rates: (a) retroactive to May 13, 2013 and continuing for years 1 through 3, 2.0%; (b) year 4, 3.0%; (c) year 5, 3.5%; (d) year 6, 4.5% and (e) year 7 and thereafter, 5.0%.  Credit of 1.25 times the payment amount applied to all scheduled monthly payments made through December 31, 2016.  Additional credit for (1) Sale Property payments and any other unscheduled payments including monthly payments of $13,512.74 made since May 13, 2013, as follows: (a) 2.22 times the payment amount through the earlier of 60 days from the Effective Date or December 31, 2013; (b) 2 times the payment amount from the end date of (a) above through June 30, 2014; (c) 1.67 times the payment amount for the 18 month period beginning July 1, 2014 through December 31, 2015; and (d) 1.43 times the payment amount for the 12 month period beginning January 1, 2016 through December 31, 2016; and (2) Effective Date Payment and Trust Account Payment as follows: (a) 2.22 times the payment amount if made on or before February 15, 2014 and (b) 2.0 times the payment amount if made after February 15, 2014 but prior to July 1, 2014.  Maintains lien on the Real Estate and personal property and releases lien on the pledged Series A First Mortgage Bonds. | | | |

8

| Class/Type of Claim | Projected Amount of Claims | Projected Recovery | Impaired/ Unimpaired |
|---|---|---|---|
| Class 2: Allowed Secured Claim of the Bondholders of the Series A First Mortgage Bonds | Approximately $6,840,000.00 | 100% | Impaired |

**Class Treatment -** Paid in full within 20 years.  Monthly payments of principal and interest paid to the Series A Trustee (who will make semi-annual payments to the Series A bondholders) in (a) years 1 through 4, $28,050 unless the Scatterfield Road Property has sold; (b) if the Scatterfield Road Property has sold, years 3 and 4, $30,250; (c) years 5 through 7, $32,450; (d) years 8 through 10, $34,375; and (e) years 11-20, $62,500; provided that if OSK is paid in full prior to the 10th anniversary, then any monthly payments otherwise payable to OSK shall be paid to the Series A Trustee.  Interest on the balance due shall be paid at the following rates: (a) retroactive to May 13, 2013 and continuing for years 1 through 3, 2.5%; (b) year 4, 3.5%; (c) year 5, 4.0%; (d) year 6, 5.0%; and (e) year 7 and thereafter, 5.5%.  Other payments: (a) on the Effective Date, the Effective Date Payment and the Trust Account Payment and (b) upon any sale of the Sale Property.  Maintains lien on the Real Estate and personal property

| Class/Type of Claim | Projected Amount of Claims | Projected Recovery | Impaired/ Unimpaired |
|---|---|---|---|
| Class 3: Allowed Unsecured Claim of the Bondholders of the Series B Subordinate General Mortgage Bonds | Approximately $6,384,000.00 | 100% | Impaired |

**Class Treatment -** Paid in full within 25 years.  Monthly payments to the Paying Agent for the Holders of Allowed Class 3 Unsecured Claims (who will make annual or, at the Series B Trustee's discretion, more frequent payments to the Series B bondholders) of principal in (a) years 1 through 4, $2,907.20, unless the Scatterfield Road Property has sold; (b) if the Scatterfield Road Property has sold, years 3 and 4, $3,634.00; (c) years 5 through 7, $4,360.80; (d) years 8 through 20, $5,451.00 and (e) year 21 and thereafter $50,876.00 with a balloon payment consisting of all unpaid principal on the 25th anniversary of the Distribution Date; provided, that if the Allowed Class 2 Secured Claim has been paid in full prior to the 20th anniversary, then any monthly payment otherwise payable to the Series A Trustee shall be paid to the Paying Agent for the Series B and the Series C bondholders to be shared pro-rata between the Allowed Class 3 and Allowed Class 4 Unsecured Claims.  Releases subordinate lien on Real Estate and personal property.

| Class/Type of Claim | Projected Amount of Claims | Projected Recovery | Impaired/ Unimpaired |
|---|---|---|---|
| Class 4: Allowed Unsecured Claim of the Bondholders of the Series C General Obligation Bonds | Approximately $2,497,245.00 | 100% | Impaired |

**Class Treatment -** Paid in full within 25 years.  Monthly payments to the Paying Agent for the Holders of Allowed Class 4 Unsecured Claims (who will make annual or, at the Series C Trustee's discretion, more frequent payments to the Series C bondholders) of principal in (a) years 1 through 4, $1092.80, unless the Scatterfield Road Property has sold; (b) if Scatterfield Road Property has sold, years 3 and 4, $1,366.00; (c) years 5 through 7, $1,639.20; (d) years 8 through 20, $2,049.00 and (e) year 21 and thereafter $19,124.00 with a balloon payment consisting of all unpaid principal on the 25th anniversary of the Distribution Date; provided, that if the Allowed Class 2 Secured Claim has been paid in full prior to the 20th anniversary, then any monthly payment otherwise payable to the Series A Trustee shall be paid to the Paying Agent for the Series B and the Series C bondholders to be shared pro-

| rata between the Allowed Class 3 and Allowed Class 4 Unsecured Claims. | | | |
|---|---|---|---|
| **Class/Type of Claim** | **Projected Amount of Claims** | **Projected Recovery** | **Impaired/ Unimpaired** |
| Class 5:  Allowed Unsecured Trade Claims | Approximately $-0- (None known) | 100% | Impaired |
| **Class Treatment -** Paid in full in three (3) equal monthly installments of principal commencing on the Distribution Date. | | | |

### E.      Funding of the Plan

The Plan will be funded by the Reorganized Debtor's:  (a) cash on hand, weekly tithing of the members, unrestricted member donations and miscellaneous income; and (b) disposition of the Sale Property.

### F.      Execution of Amended and Restated Instruments and Vesting of Assets in the Reorganized Debtor

On the Effective Date, the Reorganized Debtor will execute and deliver all of the amended and restated instruments attached as Exhibits to the Plan and all of the assets, properties and rights of the Debtor of every type and description, tangible and intangible, wherever located, shall be transferred and automatically vested in the Reorganized Debtor free and clear of all liens, claims, rights of setoff, security interests, pledges, encumbrances, adverse rights of interest, covenants, charges, debts and contractually imposed restrictions, except as otherwise provided in the Plan.

**AS OF THE EFFECTIVE DATE, THE SERIES A, B AND C BONDS ISSUED IN 2007 WILL BE CANCELLED AND REPLACED WITH NEW BONDS AS PROVIDED IN THE AMENDED AND RESTATED TRUST INDENTURES, PLAN EXHIBITS E, F AND G.**

10

G.     Authorization to Effectuate the Plan

The Plan authorizes the Debtor and Reorganized Debtor to take or cause to take all action necessary and appropriate to consummate the Plan prior to and after the Effective Date as well as to execute and deliver all documents and instruments contemplated by the Plan.

H.     Causes of Action and Bankruptcy Causes of Action

All Causes of Action shall be transferred at Confirmation to the Reorganized Debtor, who shall then have the right to commence and pursue all Causes of Action. Neither the Debtor nor the Reorganized Debtor believes it is in the best interests of the Estate to pursue the Bankruptcy Causes of Action, nor are they aware of any Bankruptcy Causes of Action; accordingly, if the Plan is Confirmed the Debtor and Reorganized Debtor will waive and release any and all Bankruptcy Causes of Action as of the Effective Date.

The Debtor and Reorganized Debtor shall retain the exclusive right and authority to bring, litigate and and/or settle any and all Causes of Action pursuant to § 1123 of the Bankruptcy Code.

The Causes of Action retained by the Debtor and Reorganized Debtor includes, but are not limited to, the following:

- Failure of any Entity to fully perform under contracts with the Debtor prior to assumption or rejection of such contract;

- Claims for deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor or Entity;

- Claims for damages or other relief against any party arising out of environmental or product liability matters;

11

- Actions against insurance carriers relating to coverage, indemnity or other matters;

- Claims arising in contract, tort, or equity which may exist or subsequently arise.

I.    Executory Contracts

    1.    TREATMENT OF EXECUTORY CONTRACTS

The Executory Contracts listed on Exhibit "H" of the Plan, as may be amended from time to time, and as otherwise provided in the Plan, will be rejected by the Debtor as of the Effective Date.  The Confirmation Order shall constitute approval under §§ 365 and 1123(b)(2) of the Bankruptcy Code of the assumption and assignment of all Executory Contracts not listed on Exhibit "H" pursuant to the Plan.  Similarly, the Confirmation Order shall constitute rejection of the Executory Contracts listed on Exhibit "H" of the Plan, as may be amended.

    2.    CURE OF DEFAULTS FOR ASSUMED AND ASSIGNED EXECUTORY CONTRACTS

The Debtor does not believe that it is in default with respect to any Executory Contracts not listed on Exhibit "H" and as a result there are no cure payments for Executory Contracts assumed pursuant to the Plan.  Any disputes over the proper cure payment that are not resolved among the parties will be determined by the Bankruptcy Court after notice and a hearing.

    3.    RESOLUTION OF OBJECTIONS TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR CURE PAYMENT

Any objection to the assumption and assignment of Executory Contracts pursuant to the Plan or to the proposed cure payment must be filed, in writing, on or before the date set by the Bankruptcy Court for filing objections to the Plan.  Any such

objection not relating to the proposed cure payment will be heard in conjunction with the hearing on Confirmation of the Plan.  Any objection relating to the proposed cure payment shall be heard at such time and date as scheduled by the Bankruptcy Court. The Debtor reserves the right to reject an Executory Contract should a cure payment be determined in an amount such that its payment is not in the best interests of the Debtor.

J.      Provisions Governing Distributions

The Reorganized Debtor will make distributions to Reliance Trust Company, as the Paying Agent under the Amended and Restated Trust Indentures.  The Paying Agent is responsible under the Amended and Restated Trust Indentures for making payments directly to the bondholders who are the beneficiaries of the Allowed Class 2, 3 and 4 Claims.  The Reorganized Debtor shall make distributions to Holders of Allowed Class 1 and Allowed Class 5 Claims under the Plan in the manner, timing and method set forth in the Plan.  Distributions will be made to the address of the Holder as set forth in the Debtor's Schedules, unless such address has been superseded by a different address contained in a proof of Claim or by written correspondence by the Holder to the Debtor.  Should any distribution be returned as undeliverable, and the Reorganized Debtor, after reasonable inquiry, cannot locate a proper address, no further deliveries will be made and such distributions will become property of the Reorganized Debtor.

Any distribution that is not negotiated within 60 days of issuance will be null and void.

The Reorganized Debtor must file any objections to Disputed Claims on or before 30 days after the Confirmation Date or  such other time as may be authorized by the Bankruptcy Court.  Objections to Disputed Claims will be litigated to a Final Order

except to the extent the Reorganized Debtor withdraws the objection or the Reorganized Debtors and the Holder of the Disputed Claim compromise such Disputed Claim.  Any compromise of a Disputed Claim that results in an Allowed Claim greater than or equal to $10,000 more than was listed as the amount owing such Holder in the Debtor's Schedules shall require the approval of the Bankruptcy Court.  Once a Disputed Claim becomes an Allowed Claim, distributions on account of such Claim shall be made as soon as practicable provided that the Holder of the now- Allowed Claim shall not receive more than it would have received had such Claim been an Allowed Claim.

The Debtors may request that the Bankruptcy Court estimate a Disputed Claim for voting purposes pursuant to § 502(c) of the Bankruptcy Code.

Professionals employed pursuant to §§ 327 and/or 328 of the Bankruptcy Code shall file final applications for compensation and reimbursement of expenses for fees and expenses incurred prior to the Effective Date pursuant to §§ 330 or 503(b) of the Bankruptcy Code within 30 days of the Effective Date.

K.      Exculpation and Release

Except for acts or omissions constituting gross negligence or willful misconduct, the Debtor and its Board of Elders,  employees, agents, and professionals shall neither have nor incur any liability to any Person or Entity for any act taken, or omitted to be taken, prior to or after the Petition Date in connection with, or related in any way to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or any other agreement or document created, or entered into, in

connection with the Plan, or any other act taken, or omitted to be taken, prior to or after the Petition Date in connection with, or in contemplation of the Chapter 11 Case and all previous efforts at restructuring or refinancing the Debtor's obligations.

On the Effective Date, the Reorganized Debtor will give OSK and certain related parties a release as part of the Amended and Restated Loan Agreement terms.

L.      Management of the Reorganized Debtor

The Board of Elders and officers of the Debtor serving in such capacity as of the Confirmation Date will continue to serve in such capacities as members of the Board of Elders and officers of the Reorganized Debtor, subject to any future action taken by the Reorganized Debtor's Board of Elders or members (as applicable) in accordance with applicable non-bankruptcy law.

M.      Effects of Confirmation

As of the Effective Date, all of the assets and rights of the Debtor will be transferred to the Reorganized Debtor.  The Reorganized Debtor shall be able to use, acquire, sell or otherwise dispose of these assets without any restrictions from the Bankruptcy Code except for those restrictions required by the Plan.

Except as provided in § 1141(d)(3) of the Bankruptcy Code, as of the Effective Date the provisions of the Plan shall be binding upon any Holder of a Claim against the Debtor.  All injunctions and stays provided for in the Chapter 11 Case in existence as of the Confirmation Date shall remain in full force and effect until all distributions are made under the Plan unless provided otherwise in the Plan or an order of the Bankruptcy Court.  As of the Effective Date all Entities are permanently enjoined from bringing or

continuing any action or proceeding on any Claim or Cause of Action or Bankruptcy Cause of Action.

Except as otherwise provided in the Plan, the treatment of Claims in the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims against the Debtor.  Similarly, as of the Effective Date all Entities shall be precluded from asserting any Claims arising prior to the Effective Date against the Reorganized Debtor.  The sole remedy of such Entities will be to bring an action against the Reorganized Debtor for a breach of its obligations under the Plan.

### N.    Retention of Bankruptcy Court Jurisdiction

The Bankruptcy Court will retain jurisdiction to hear all matters arising under, arising out of, or related to the Chapter 11 Case and the Plan.  A non-exhaustive list of such matters is provided in Article XI of the Plan.

### O.    Modification of the Plan

The Debtor reserves the right to amend or modify the Plan at any time prior to the entry of the Confirmation Order.  The Debtor also reserves the right to amend or modify the Plan after the Confirmation Order is entered after notice and a hearing and in compliance with § 1127(b) of the Bankruptcy Code.  If the Debtor seeks such a modification or amendment, a Holder of a Claim who voted to accept the Plan shall be deemed to have voted to accept the Plan as modified or amended if such modification or amendment does not materially and adversely alter the treatment of such Holder's Claim.

P.     Discharge of Debtor Pursuant to the Plan

Except as otherwise provided in § 1141(d) of the Bankruptcy Code, the Plan, or

the Confirmation Order, Confirmation of the Plan shall discharge the Debtor from any

debt that arose before the Confirmation Date and any debt of the kind specified in §§

502(g), (h) or (i) of the Bankruptcy Code, whether or not:  (1) a proof of Claim based

upon such debt is filed pursuant to § 501 of the Bankruptcy Code; (2) a Claim based

upon such debt is allowed under § 502 of the Bankruptcy Code; or (3) the Holder of a

Claim based upon such debt has accepted the Plan.

Q.     Tax Consequences of the Plan

As a not for profit religious organization, there are no significant tax

consequences resulting from the Plan on the Reorganized Debtor.  The Debtor also has

not sought to determine the state/commonwealth or federal income tax consequences

the Plan may have on Holders of Claims.

**ACCORDINGLY, ANY ENTITIES WHO MAY BE AFFECTED BY THE
IMPLEMENTATION OF THE PLAN, INCLUDING BONDHOLDERS AND OTHER
HOLDERS OF CLAIMS IN THE DEBTOR, SHOULD CONSULT THEIR OWN TAX
ADVISORS RESPECTING THE TAX CONSEQUENCES THE PLAN MAY HAVE ON
SUCH BONDHOLDERS OR OTHER HOLDERS OF CLAIMS UNDER FEDERAL,
STATE/COMMONWEALTH, LOCAL OR FOREIGN LAW**.

## V.     CONFIRMATION OF THE PLAN

A.     Acceptance or Rejection of the Plan

In accordance with §§ 1126 and 1129 of the Bankruptcy Code, Holders of

Allowed Claims in Classes 1, 2, 3, 4, and 5 are Impaired and are entitled to vote to

accept or reject the Plan.

The Bankruptcy Code provides that a Class will accept the Plan if: (1) at least one-half of Holders of Allowed Claims in a Class; and (2) at least two-thirds in dollar amount of Holders of Allowed Claims in a Class have voted in favor of the Plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  Holders of Claims that do not vote on the Plan will not be counted as either accepting or rejecting the Plan.  Holders of Disputed Claims are not entitled to vote on the Plan absent further Order of the Court.

Any Holder of a Claim in an Impaired Class: (1)(a) whose Claim has been listed by the Debtor in its Schedules and is not marked contingent, disputed, or unliquidated; or (b) who filed a proof of Claim; and (2) whose Claim is not the subject of an objection or request for estimation, is entitled to vote on the Plan.

In the event one or more Impaired Classes vote to reject the Plan, the Debtor shall seek Confirmation of the Plan pursuant to the "cramdown" provisions contained in § 1129(b) of the Bankruptcy Code.  In addition, in the event Class 3 votes to reject the Plan, the Holders of the Allowed Class 1 and Class 2 Secured Claims reserve their right to exercise the assignment of voting rights given to them under the Subordination and Standstill Agreement entered into by the parties on August 13, 2007 and recorded on August 23, 2007 in the office of the recorder of Madison County, Indiana as Instrument No. 2007-016044.

B.    Unfair Discrimination and Fair and Equitable Tests

Should any Impaired Class reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if the Plan "does not discriminate unfairly"

and is fair and equitable" with respect to each Impaired Class which has not accepted the Plan.  Both tests must be met before the Plan can be confirmed.

The Bankruptcy Code provides that a plan "does not discriminate unfairly" if the legal rights of a rejecting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the rejecting Class and if no Class of Claims receives more than it is legally entitled to receive for its Claims.  This test is the same whether the Claim is secured or unsecured.

This differs from the Bankruptcy Code's test for "fair and equitable" as that test differs depending on whether the rejecting Class is comprised of Secured Claims or Unsecured Claims.  With respect to a Secured Claim, "fair and equitable" means:  (1) the Impaired secured creditor retains its liens to the extent of its Allowed Secured Claim and receives deferred Cash payments at least equal in value to the allowed amount of its Claim with a present value as of the Effective Date at least equal in value to such creditor's interest in the property securing such Claim; (2) if the collateral subject to the lien of the Impaired secured creditor is sold free and clear of liens, claims, interests and encumbrances, such lien, claim, interest and encumbrance attaches to the proceeds of the sale and the attached lien, claim, interest and encumbrance is treated in accordance with subsection (1) or (3) of this paragraph; or (3) the Impaired secured creditor realizes the "indubitable equivalent" of its Claim under the Plan.  With respect to an Unsecured Claim, "fair and equitable" means either:  (a) each Impaired unsecured creditor receives or retains property of a value, as of the Effective Date, equal to the amount of its Allowed Claim; or (b) the Holders of Claims that are junior to the rejecting Class will not receive or retain any property under the Plan.

19

This Plan "does not discriminate unfairly" because all similar Classes are treated consistently and no Class receives more under the Plan than to which it is legally entitled.  The Plan is also "fair and equitable" as to all Impaired Classes as they will receive the full value of their Allowed Claims over time.

C.    Best Interests Test

The Bankruptcy Code also provides that the Plan will not be confirmed, regardless of whether an Entity objects to the Plan, unless the Bankruptcy Court finds that the Plan is in the "best interests" of all Impaired Classes.  A Plan will be deemed in the "best interests" of all Impaired Classes if either:  (1) all Holders of Impaired Claims have accepted the Plan; or (2) the Plan will provide Holders of Impaired Claims who have rejected the Plan with a recovery at least equal in value to the recovery such Holder would receive if the Debtor liquidated its assets under chapter 7 of the Bankruptcy Code.

The starting point then under this test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtor's assets in the context of a chapter 7 liquidation.  That amount then must be reduced by the costs of such liquidation, including the costs incurred during the Chapter 11 Case and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses), the chapter 7 trustee fee, and the fees and expenses of professionals retained by the chapter 7 trustee.  This new subtotal must then be further reduced by the costs imposed by the delay caused by conversion of the Chapter 11 Case to a liquidation case under chapter 7.  This net present value of a hypothetical chapter 7 liquidation distribution with respect to an Impaired Class is then compared to the recovery such Impaired Class

receives under the Plan.  A Liquidation Analysis is attached hereto as **Exhibit B**.  The assumed proceeds from this Liquidation Analysis are then allocated to each Impaired Class according to their rights and priorities and a recovery is estimated for each Impaired Class.  Since there are several variables involved in the Plan that can change the timing and allocation of payments to each Impaired Class, two (2) scenarios have been provided in order to show the impact of these variables.  Furthermore, these scenarios show the likely  high and low range and, even at these extremes, the net present value of the Chapter 11 payments is greater than the hypothetical Chapter 7 liquidation (excluding Class 1 which has agreed to be paid at a negotiated discount).  The net present value of the Chapter 11 payments is estimated taking into account the timing and amount of the Effective Date Payment, Trust Account Payment and Sale Property payments and adjusting the allocation of the payments accordingly as each Impaired Class is fully paid.

The estimates for values and recoveries listed in the Liquidation Analysis are based upon appraisals of the Real Estate conducted in the Fall of 2012 and the experience of the Debtor's professionals in liquidating property in a chapter 7 liquidation.  Although the Debtor received an offer for 16 of the 136 excess acres which comprises a portion of the Sale Property at a price which greatly exceeds the appraised value, that offer is contingent upon numerous factors which make a closing on the purchase thereof highly speculative.  Even if a sale occurred at the proposed purchase price, all Impaired Classes (except Class1) receive a greater recovery under the Plan.

D.     Feasibility

The Bankruptcy Code also provides that the Plan can only be confirmed if it is feasible.  The Plan will be considered feasible if it will not lead to a further liquidation or reorganization of the Debtor.  The Debtor believes that the projections attached hereto as **Exhibit C** demonstrate that the Reorganized Debtor can make the distributions required under the Plan and continue its mission.

The projections are on a Cash basis.  All disbursements to Classes 1-5 have been listed as separate line items.  Although the Reorganized Debtor's projected Cash balance varies throughout the projections, the Reorganized Debtor has sufficient Cash to cover all projected distributions.  Based upon these projections, the Reorganized Debtor will be able to make the distributions required under the Plan.

## VI.     CONCLUSION

The Debtor explored various restructuring scenarios with its professionals. Based upon that review, the Debtor believes that the Plan represents the best alternative for the Debtor, the Estate, and Holders of Claims.  The Debtor therefore urges all Holders of Claims entitled to vote to cast their ballots in favor of the Plan.

Dated: September 11, 2013          MADISON PARK CHURCH OF GOD, INC.,
                                   as debtor and debtor-in-possession,


                          By:     /s/ F. Rob Spaulding
                                  F. Rob Spaulding, Business Administrator

1850912v8